UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

---

SECURITIES AND EXCHANGE COMMISSION, :
100 F Street, N.E.
Washington, DC 20549
:
:
:
: Plaintiff,
:
:
v.    :    **COMPLAINT**
:
DAVID G. ZILLI,    :
19793 Shorecrest Drive
Clinton Township, Michigan 48038
:
:
:
: Defendant.
:

---

Plaintiff Securities and Exchange Commission (the "Commission") alleges that:

## SUMMARY OF ALLEGATIONS

1. During the fiscal years 1998 through 2003, David G. Zilli, the Chief Financial Officer of Bon Secours Cottage Health Services ("Cottage Health"), a majority-owned subsidiary of the Maryland-based, non-profit, Catholic health system, Bon Secours Health System, Inc. ("Bon Secours"), engaged in an extensive scheme of fraudulent accounting practices that created the false appearance of steady earnings growth at Cottage Health. Zilli's fraud was accomplished through bogus manual journal entries that overstated the value of numerous assets and the operating income of Cottage Health, and understated its liabilities.

2. As a result of Zilli's fraudulent accounting scheme, Bon Secours' financial statements were cumulatively misstated by an aggregate amount of $117 million during the period between 1998 and 2003. In February 2004, the Company restated its 2002 consolidated financial statements in order to correct the impact of Zilli's fraudulent accounting on that year

and several prior fiscal years.

## JURISDICTION

3.  This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v] and Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. The Defendant made use of the means or instruments of interstate commerce or of the mails in connection with the acts, transactions, practices and courses of business alleged herein.

## DEFENDANT

4.  **David G. Zilli**, age 48, was Cottage Health's Chief Financial Officer from 1998 to June 2003. Zilli is a resident of Michigan. He is licensed as a certified public accountant in the state of Texas.

## BACKGROUND OF BON SECOURS HEALTH SYSTEM, INC. AND THE RESTATEMENT

5.  Bon Secours is a Maryland-based, non-profit, Catholic health system that owns, manages, or has joint ventures involving 24 healthcare-related operations in nine states. During the period of 1998 through 2003, Bon Secours issued approximately $2.25 billion in outstanding corporate bonds, including $938 million in bonds issued through public offerings. Cottage Health is a Michigan-based, non-profit, joint venture of which Bon Secours is the majority owner. Cottage Health includes 28 facilities in Michigan, including Bon Secours Hospital and Cottage Hospital in Gross Pointe, Michigan. Bon Secours is responsible for oversight of Cottage Health.

6.  In October 2003, Bon Secours announced that it had discovered accounting

irregularities in the books of Cottage Health and that it was commencing an internal investigation. On January 28, 2004, Bon Secours announced, via a press release, that it had completed its investigation and determined that Cottage Health's income and assets were overstated by approximately $117 million over a multi-year period.

7. The misstatements materially inflated Bon Secours' "increase in unrestricted net assets," the equivalent of net income for a non-profit enterprise, by approximately the following amounts: (a) $20.1 million or 75% in fiscal year 2000; (b) $15.4 million or 31% in fiscal year 2001; and (c) $17.9 million or 270% in fiscal year 2002. Additionally, the misstatements materially overstated Bon Secours' income from operations by approximately the following amounts: (a) $22.9 million or 106% in fiscal year 2000; (b) $20.6 million or 51% in fiscal year 2001; and (c) $21.9 million or 42% in fiscal year 2002.

### ZILLI'S FRAUDULENT ACCOUNTING SCHEME

8. Zilli was the Vice President-Finance and CFO of Cottage Health from the formation of the joint venture subsidiary in September 1998 through June 2003. During that time, Zilli supervised Cottage Health's accounting department, which consisted of approximately eight to twelve employees from 1998-2003, and was ultimately responsible for the creation of the financial statements of the subsidiary. On a periodic basis, Zilli generated Cottage Health's financial statements and forwarded them to the finance department of Bon Secours where they were consolidated with those of the other subsidiaries to create Bon Secours' annual consolidated financial statements. Bon Secours included the consolidated financial statements in various public bond offerings made to investors.

9. Cottage Health's accounting system employed a combination of both automated

and manual entries that were entered into its general ledger. The accounting department generated manual entries for items such as depreciation, accounts payable, debt, cash, and other entries that were not automatically updated to the general ledger system. Manual entries were also used to make month-end and year-end adjusting journal entries.

10.     At the end of each monthly period, the accounting department prepared preliminary financial statements for each of the Cottage Health entities and forwarded them to Zilli for review. From approximately 1998 through 2003, after reviewing the preliminary statements, Zilli, on numerous occasions, independently devised complex adjusting journal entries lacking any support or accounting basis. The accounting department then finalized the monthly reports for Cottage Health after making the adjustments that Zilli had instructed the accounting personnel to make. The adjustments artificially and fraudulently boosted Cottage Health's income in each period and resulted in reported performance figures that met Bon Secours' financial targets for the subsidiary. Afterwards, Zilli or others in the accounting department forwarded the (now fraudulent) finalized reports by email to the Bon Secours finance department to consolidate with the reports of the company's other subsidiaries in its annual financial statements.

11.     Zilli's false adjusting entries overstated Cottage Health's assets and operating income by an aggregate total of approximately $117 million. The adjustments overstated three general categories of assets: accounts receivable, fixed assets, and inventory. Zilli overstated accounts receivable by approximately $46 million, which affected patient accounts receivable, as well as third-party and other miscellaneous receivables. Specifically, a substantial portion of the overstatement related to non-existent third party and miscellaneous receivables that were

recorded in the general ledger without any basis. Zilli fabricated the accounts. In addition, Zilli falsely inflated legitimate accounts receivable through adjustments to the contractual allowance, bad debt allowance, and other related accounts. Zilli inflated fixed assets by approximately $65 million. This category included an overstatement of fixed assets by approximately $56 million, and an understatement of depreciation expense by approximately $9 million. Zilli carried out this part of his scheme by falsely reducing previously recorded operating expenses and offsetting them by a corresponding increase to fixed assets. Zilli also under-reported depreciation expenses by recording fabricated estimates that were unreasonably low. In addition, Zilli reclassified a number of expenses as inventory assets, thereby inflating inventory by $4 million. Furthermore, Zilli understated reserves for managed care outpatient rate adjustments by $2 million.

12.     Zilli routinely created the fraudulent journal entries to derive the specific income amount that he wanted to book for the particular period in order to ensure that Cottage Health's reported performance figures met its financial targets. Cottage Health had the reputation within the Bon Secours network for consistently meeting its budget targets. Zilli's month-end adjusting entries typically had the effect of increasing Cottage Health's net income and profitability levels. One example of the manner in which Zilli carried out his scheme is illustrated by the October 2000 month-end closing documents for Bon Secours Hospital, one of the Cottage Health entities. For that period, Zilli created a set of adjusting entries that he provided to the Cottage Health controller to enter into the general ledger. Zilli wrote a note to the controller and attached it to the set of manual journal entries, providing an instruction to "Book $351,000." This instruction directed the controller to enter the adjusting journal entries that Zilli provided into Cottage Health's general ledger to arrive at an ultimate (albeit false) income figure of $351,000 for the

month of October 2000 for Bon Secours Hospital. Zilli's instruction was followed and the October 2000 income was falsely recorded as $351,000. There was no proper basis for this and many other such journal entries that Zilli devised.

### DISCOVERY OF ZILLI'S FRAUDULENT ACCOUNTING SCHEME

13.     Zilli's adjusting entries for May 2003 were particularly unusual, and ultimately triggered a Bon Secours audit of Cottage Health. One such adjustment was for an unsupported write-off of $9.7 million, allegedly related to hospice care at Cottage Hospital, one of the Cottage Health entities. Bon Secours was concerned with the magnitude of this adjustment, and soon initiated an intensive audit of Cottage Health, which the Company conducted only once every few years. The internal auditors began questioning Zilli and his staff about some of the accounting adjustments that they made to the various Cottage Health entities during fiscal year 2003. Zilli instructed his staff to refer any such inquiries directly to him. Zilli then stalled in getting explanations to the internal auditors, and provided deceptive answers to their questions in his attempts to continue to conceal his fraudulent practices.

14.     Zilli unexpectedly left the employment of Cottage Health in June 2003, still on good terms with the company, to take a position with a smaller hospital in Michigan. Zilli continued to provide misleading answers to the internal auditors and to Bon Secours finance personnel who were attempting to understand Cottage Health's accounting irregularities for several months after he left Bon Secours.

### IMPACT OF THE ACCOUNTING FRAUD ON BON SECOURS

15.     Bon Secours' announcement of the discovery of the fraud and its subsequent restatement of its financials to correct for the $117 million in cumulative misstatements had

various adverse consequences for the company. The overstatements of Bon Secours' assets caused the company to exceed its indebtedness ratio target at the end of its fiscal year 2003. The increased indebtedness ratio resulted in a breach of the company's covenants with two of its bond insurers. Although the company was able to negotiate an amendment to the affected covenant with one of the bond insurers, Bon Secours must now annually request a waiver of the relevant covenant with the second bond insurer in order to avoid a breach of the agreement pertaining to its indebtedness ratio.

16.     The news of the accounting fraud at Cottage Health negatively impacted the ratings of Bon Secours' bonds. On January 30, 2004, two days after Bon Secours' press release disclosing the findings of its internal investigation into the accounting issues, Standard & Poor's reported a revision to its outlook from stable to negative on bonds issued for Bon Secours.

17.     Moody's placed Bon Secours' bond ratings on Watchlist on January 28, 2004 for possible downgrade in response to the company's press release of the same date. Moody's removed the bond ratings from Watchlist on March 15, 2004. Nevertheless, at the same time, Moody's revised its outlook on Bon Secours' bonds from stable to negative due, in part, to the realization that Bon Secours had weaker debt coverage measures than Moody's previously had believed, as exposed by the discovery of the misstatements in the company's financial statements.

## FIRST CLAIM

### Violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

18.     Paragraphs 1 through 17 above are realleged and incorporated by reference herein.

19.	As set forth more fully above, defendant Zilli, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national exchange, in connection with the purchase or sale of Bon Secours securities, has with knowledge or recklessly, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit upon any person.

20.	By reason of the foregoing, defendant Zilli violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

21.	Bon Secours issued approximately $2.25 billion in outstanding corporate bonds during fiscal years 1998–2003, consisting of $938 million in bonds through public offerings. The bonds issued through public offerings during this period included misstated consolidated financial information of Bon Secours caused by defendant Zilli's fraud.

22.	In these offers or sales of securities, defendant Zilli directly or indirectly: (a) employed a device, scheme, or artifice to defraud; or (b) obtained money or property by means of an untrue statement of a material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

23.	By reason of the foregoing, defendant Zilli violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

(a) permanently enjoining defendant Zilli from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

(b) entering an order under Section 20(e) of the Securities Act [15 U.S.C. § 77t(d)(4)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] prohibiting defendant Zilli from acting as an officer or a director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

(c) ordering defendant Zilli to disgorge ill-gotten gains wrongfully obtained as a result of his illegal conduct;

(d) ordering defendant Zilli to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(e) granting such other and further relief as this Court deems necessary and appropriate under the circumstances.

Dated: November 1, 2005
Washington, D.C.

_Paul W. Kisslinger_
Paul W. Kisslinger
Michael K. Catoe
Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202.551.4427 (Trial Unit Counsel)
202.772.9246 (Fax)

Of Counsel:

Paul R. Berger
Richard W. Grime
Kevin M. Loftus
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549